# UNITED STATES DISTRICT COURT

## for the

## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| <u>ANNE ARMSTRONG</u> | ) | |
| | ) | |
| First Plaintiff | ) | |
| | ) | |
| and | ) | |
| | ) | |
| <u>ALAN GORDON</u> | ) | Civil Action No. |
| Second Plaintiff | ) | |
| | ) | **CA 16- 403** |
| v | ) | |
| | ) | |
| Peter Kilmartin, | ) | |
| in his capacity as Attorney General for the State of | ) | |
| Rhode Island and Providence Plantations | ) | |

1. **CONSTITUTIONAL ACTION FOR INJUNCTIVE RELIEF**

2. **PLAINTIFFS' MOTIONS FOR**

    A. **PRELIMINARY INJUNCTION AND/OR STAY OF DEFENDANT STATE'S THREATENED ENFORCEMENT ACTION**

    B. *IN LIMINE,* **REGARDING DEROGATORY LANGUAGE BY THE DEFENDANT STATE**

    C. **TIMELY INSTRUCTION BY THE COURT TO ITSELF, PRIOR TO EXPOSURE TO DEFENDANT STATE'S DEROGATORY LANGUAGE**

<u>Introductory Outline of Legal Point to Be Tried:</u>

1. Rev. Drs. Anne Armstrong and Alan Gordon ("PLAINTIFFS"), both of 99 Hudson Pond Road, West Greenwich, in Rhode Island (IN RI) bring suit against the State of Rhode Island and Providence Plantations for religious discrimination in violation of the Establishment, Free Exercise, Due Process, and Equal Protection clauses of the United States (US) Constitution.

2. Plaintiffs allege that under RI statute, religious exemption to the RI general statutory cannabis restriction[1] is not expressly available in any listed exemptions, neither the police/licensed practitioner and authorized agents exemptions[2], nor medical patient/caregiver/assistant exemptions[3], nor anywhere else in RI statute. While this alone may or may not be Constitutionally tolerable, the situation is much worse for the State of RI.

3. Plaintiffs allege that lack of relevant specific statutory religious exemption leaves the Plaintiffs subject to, if they mean to obtain statutory protection against a general ban, what the State's <u>Religious Freedom Restoration Act</u>[4] and federal <u>Religious Land Use and Institutionalized Persons Act</u>[5] refer to as "burdens," and which in practical terms cannot actually be met in the case of cannabis (see below). Plaintiffs further alleged that these statutory and practical

---

[1] <u>RI § 21-28</u>

[2] <u>RI § 21-28-3.30</u>

[3] <u>RI § 21-28.6</u>

[4] <u>RI 42-80.1</u>

[5] <u>42 U.S.C. § 2000cc et seq.</u>

burdens are, in statute and practice, never applied to Jewish, Catholic, Episcopalian and Lutheran ("JCEL)," 4 distinct religious sects, who are in the context of analogous ordinarily-banned behavior statutorily protected from any statutory or practical burdens[6] despite giving an **adulterated (as proved in supporting material witness affidavits citing relevant church law)** addictive, toxic, violence-inducing drug, wine ethanol, to children as young as 7 in Christian contexts, and unadulterated in Jewish contexts but almost always starting at age 13 (with occasional infant wine use during effectively protected quasi-medical home genital mutilation). This statutory protection against scrutiny for JCEL faiths' voluntary child-wine rites, compared to the statutory burdens imposed upon Originalist faith adults who use "KNH BSM" (Heb. Biblical, lit. "sweet-smelling fiber textile staff crop," as per supporting affidavit), is so fundamentally disparate that a "strict scrutiny" standard of

*"is the Originalist practice genuine, and does the law burden it?"*

is triggered. Strict scrutiny is triggered because of the absurdity of applying the RFRA-style "rational scrutiny" against one religion, while shielding another from it with statutes in such highly analogous circumstances. To subject the State's disparate treatment of the 2 worship styles itself (as opposed to the behaviors of the 2 church types, child-wine and Originalist cannabis-adult, respectively) to a rational review basis (*does the State have a compelling interest in facilitating child wine use while heavily burdening adult cannabis use in the same circumstances?*) is a meta-discrimination unto itself, but cannot be satisfied as rational without scrutiny of safety and health and authenticity of the wine-child faiths.

---

[6] RI § 3-8-11.1(d)

<u>Case Facts:</u>

4.  On or about June 23rd 2016, numerous West Greenwich RI Police and the Kent County RI Attorney General attended the Plaintiffs' residential address where cannabis is growing on land co-owned by Plaintiff Anne Armstrong and another party, some of which is leased by Plaintiff Anne Armstrong and tenant Plaintiff Alan Gordon to RI licensed medical cannabis patients and/or caregivers to grow in fenced pens, with doorways, but in fresh air and natural light. The police and attorney general noted the cannabis plants and documented what they described as "over 80." West Greenwich Police Chief Ramsay and the Kent County Attorney General expressed they felt there were too many cannabis plants, and in unlawful areas, within State medical cannabis allowances. Plaintiffs explained that the cannabis was:

A.  Religious, and so subject to far wider exceptions, as a matter of Constitutional freedom, than the medical statute's very narrow ban exemptions granted in the name of medicine; and

    .

B.  Was deliberately planted with the intention to be in accordance with plain English reading of RI statutory medical cannabis plant locations and numbers allowed in a statute, which is to be "liberally construed"[7]for the "purpose"[8] of "protect patients with debilitating medical conditions, and their physicians and primary caregivers, from arrest and prosecution, criminal and other penalties, and **property forfeiture [emphasis added]** if

---

[7] <u>RI § 21-28.6-13</u>
[8] *ibid* and <u>RI § 21-28.6-2(5)</u>

such patients engage in the medical use of [cannabis]."[9]  "Medical use" is defined (construed liberally) as:

- *"acquisition, [and/or]*
- *possession, [and/or]*
- *cultivation, [and/or]*
- *manufacture, [and/or]*
- *use, [and/or]*
- *delivery, [and/or]*
- *transfer, [and/or]*
- *transportation. . .*

*. . . of [cannabis] or paraphernalia relating to the consumption of [cannabis]  to alleviate a patient cardholder's debilitating medical condition or symptoms associated with the medical condition"*[10].

Within that same statute law, constructive possession, etc., charges are not to be prosecuted against those who "assist" a patient (such as spouses or roommates, for example) in their "medical use" of cannabis[11] (therefore including all aspects, such as cultivation, as per the definition of medical use) -- interpreted liberally for the purposes the law states.  **The**

[9] § 21-28.6-2(5)
[10] RI § 21-28.6-3(7)
[11] 21-28.6-4(j)

**purpose of the above lengthy statutory explanation is not to seek federal clarification of the RI statute, but to point out the absurd levels of scrutiny of religious exercise relative to that shown those who serve adulterated wine to children.**

5. The Police Chief and Attorney General must did not take, confiscate or kill any of the cannabis on June 23rd 2016, nor since then, despite disagreeing over the statute and insisting it was unlawful, but Police Chief Ramsay advised Plaintiffs to move the cannabis plants into the address' main residential unit, which would have brought the cannabis afoul (or more afoul, if it was already) of the medical cultivation exemption limits, against Plaintiffs' stated intentions, regardless of any religious protection.

6. Plaintiff Alan Gordon then said that patients' plants were lawfully "stored" "indoors" as patients' plants are required to be[12] (interpreted liberally for the stated purposes), and that the fenced-in pens, with doorways, were sufficient structure given the law's liberal construction, and the law's express lack of roof requirement, wall opacity, plainview from street, locks, or other security features of the type Chief Ramsay said were required on June 23rd 2016. Plaintiff Alan Gordon and Chief Ramsay made a gentleman's agreement for the former to "make some progress" in getting the plants in better indoor compliance in time for daily check-ins, and a few dozen seedlings were culled later that day under this pressure, prior to a State Superior Court action against the State for urgent pre-trial injunction filed the following morning at the start of business. Another 15 quite small plants, ranging from 6 to 18 inches in height, were harvested earlier than would have occurred without the law enforcement pressure to be

---

[12] 21-28.6-4(a)

rendered into Anointing Oil. Fencing was enhanced immediately subsequent to the raid, which occurred at the end of transplanting into the ground.

7. The State Court action was unsuccessful in fuller interim hearing, and unappealable in that regard (being a temporary restraining order), leaving the plants in peril. The State's submissions were alarmingly close to honesty and integrity violations of the worst (and most biasing) sort: the State, under oral motion of biasing language supported by affidavit in evidence, bizarrely used public resources seeking to exclude common knowledge, sub-expert evidence that the statutory word for cannabis is a mis-spelled foreign slang word not used in the laws of any other country, not even the laws of the country's word of origin, introduced into the English language by notorious racists, in heavily dishonest and racist contexts, to replace the common at-the-time name for a plant which had previously been a mainstay ingredient US medicine. As in the instant case, the Plaintiffs motioned that this statutory language was akin to having a "[Derogatory Racial/Ethnic Term] Voting Rights Act" at best, preventing fair trial and due process to anyone associated. This was/is was prejudicial, and disprobative of cannabis, without any essential interest in so being, afoul of rules against apparent bias from *Holbrook v Flynn* (475 U.S. 560).

8. Defendant State of RI then improperly objected to expert opinion testimony of expert Plaintiff Alan Gordon (an expert by virtue of among other experience, a peer-reviewed June 1996 publication in a scholarly periodical, referenced in affidavit evidence, discussing medical effects of cannabis on humans, plant growth particulars, human genetic predisposition to cannabis, and populational use prevalence trends over time. The State of RI especially objected to introduction of confessional and corroborative evidence that the author of the US cannabis

ban, and the wording of the 50 States' bans, was an enemy German racial supremacist fascist Axis spy in the WWI and WWII era, while serving at the highest levels of US law enforcement, based not on the authenticity of the photographic record evidence, but on interpretational authority.

9. While a good fight is to be expected in litigation, the Plaintiffs were further shocked to see the State Attorney General successfully object to what was then hearsay (but which is here proved via material affidavit and which is so commonly-known that it was/is as needless of proof as the day of the week). That commonly-known fact is that 4 major religious sects in RI give wine, often adulterated, to little children. Why the Court should not, in the State's mind, get to weigh this matter of basic simple truth, baffles the Plaintiffs and causes them to wonder what portion of the public's interests are being served by the State Attorney General's office. To the Plaintiffs, it appears that the State has gone insane, sloughing off its public duties to adopt desperate, racist (in self-denial) and barely-if-at-all honest stall tactics, in discriminatory shock from cognitive dissonance at no longer being able to enforce the ban on the One True Faith.

10. Plaintiffs are inherently thereby substantially burdened, by statute and the lack thereof, in a way in which JCEL faiths are not, with regard to each faith's use of psychoactive substances to "Commune" with the Divine.

11. General prohibition (shy of any express religious exemption upon which Plaintiffs could rely with due legal certainty) of the Plaintiffs' "Originalist" Biblically-inspired use of cannabis sacraments is improper in light of the wide-open statutory protection given to JCEL faiths who give wine, often adulterated, to children and adults under 21. Plaintiffs claim the

aforementioned preferential treatment is in violation of the Establishment and Equal Protection Clauses of the US Constitution despite the seeming general applicability of the relevant statutes. There is a fundamental flaw, for example, in saying "since law, with general applicability, encourages child religious wine use and burdens adult cannabis use in highly analogous circumstances, the State's formulation of the correct substance and age group for substance-mediated Communion is acceptable." If such a generally-applicable law combination were subject to rational review (which we argue should not occur), it should fail on the lack of State consideration of child-alcohol compelling interests of safety and health, especially where, as alleged in evidence, it is from a shared cup, with adulterants added, or near out-patient genital mutilation. That cannot pass rational review.

12. JCEL are all receiving preferential State treatment ("Establishment") in law compared to the Plaintiffs' style of worship called "Originalism" which the State has wrongly dis-Established in law relative to JCEL. Specifically:

A. JCEL receive special statutory and discretionary protection against any State "compelling interest" probing of how, or in what manner, those faiths serve non-compulsory wine (often adulterated) to children as young as 7 or even in infancy, whereas

B. Originalist alcohol-free[13] use of Biblical "KNH BSM" (Heb., lit. "sweet smelling hemp") has been subjected to a type of legal scrutiny essentially requiring burdensome (and

---

[13] Numbers 6:3

historically, for 40 years, practically impossible to achieve[14]) proofs of religious authenticity and disproofs of the State's aggressively declared interests of nanny-State regulating -- out of existence, in practical terms -- even religious cannabis procurement, production, sharing and use in adults.


## Catholic Service of Adulterated Wine to Children as Young as 7 Protected by State Law

13. At least 2 Catholic Churches in Rhode Island (IN RI) practice "Communion" (connection to the Divine), a type or style of "religion" (re-connection to the Divine) by serving adulterated wine, called "the Blood of Christ" to persons under the age of 21 (twenty-one) and, by church law, as young as 7 (seven) years of age. Such service of adulterated wine occurs up to:

A. 12 times/week at an undergraduate (i.e. mostly age 18-21 year old students) university, at Christ the King Church at the University of Rhode Island, 90 Chapel Way, in Kingston, according to supporting affidavit material witness, as well as to the church's own web site at url http://web.uri.edu/chaplains/the-catholic-center/ accessed 10th July 2016; and

B. 9 times/week at St. Francis de Sales Catholic Church at 381 School Street in North Kingston, according to supporting affidavit material witness, as well as to the church's own web site at url http://stfrancisdesaleswdc.org/mass_schedule.htm accessed 10th July 2016.

---

[14] Bone, M. From the Sacrilegious to the Sacramental. A Global Review of Rastafari Cannabis Case Law. B.C. Labate and C. Cavnar (eds.), *Prohibition, Religious Freedom, and Human Rights: Regulating Traditional Drug Use*, DOI 10.1007/978-3-642-40957-8_5, © Springer-Verlag Berlin Heidelberg 2014

According to the supporting evidence in affidavit form, and according to commonly available undisputable fact as sure as the date of the full moon, or a given day's minute of sunrise, the law of the Catholic church, called the Canon or *Catechism*, at *Cann 11*, Communion may (not must) be given to children as young as 7 (seven) years of age, i.e. it is not even compulsory, although a 7 year old can hardly consent to ethanol consumption, let alone to adulterated forms of it.

14. Catholic Communion wine is adulterated immediately prior to the service, by crumbling a solid substance called "the Body of Christ" into it, which in Catholicism transforms the wine into something other than normal wine, and into what is called "The Blood of Christ."

15. Subsection "(d)" of the RI State general ban on giving wine to children[15] creates a statutory exemption for a general ban on provision of wine to persons under 21, in cases of religious use of the wine. This statutory protection comes with no registration or enrollment process, authenticity check, safety procedure filing, compliance officer dictate, parental approval requirement, material analysis, or any other government scrutiny, despite:

A. The adulterated ritual substance's use on children, college students under 21, and other vulnerable populations; and

---

[15] RI § 3-8-11.1

B. That particular religion (like many other faiths)'s notorious history of abusing children, and separately, of abusing religious wine and/or exemptions for it as supported in affidavit evidence.

Jewish Wine Service to Children as Young as 13, and Even in Infancy, Protected by State Law

16. Material witness evidence shows that Jewish people in RI generally give their children wine from the age of 13 at religious celebration dinners, whether at *schull,* at home, at others' homes, at restaurants and rented receptions halls, or wherever Jewish holidays Blessings are observed. Giving wine to children this way at large family gatherings often results in children self-monitoring consumption levels/pace, as well as availability of wine to children not yet 13, who do not always obey.

17. Like the Catholics, Jewish consumption of wine in children is largely or totally voluntary, and is not compulsory. Such behaviors are truly Jewish American standards from which exceptional breaches just define the rule.

18. In Orthodox and some Conservative Jewish households, male infants are given a bit of wine at circumcision, during which their genitals are sliced in quasi-medical home settings. Subsection "(d)" of the RI State general ban on giving wine to children[16] creates a statutory exemption for these activities. The statutory protection comes with no registration or enrollment process, authenticity check, safety procedure filing, compliance officer dictate, parental approval requirement, material analysis, or any other government scrutiny.

---

[16] *ibid*

Lutheran Service of Adulterated Wine to Children Protected by State Law

19. St. James Lutheran Church, 49 Middle Highway, Barrington, RI gives Communion to children, using adulterated wine, as do every other Lutheran Church in the State of RI according to church literature in material evidence, and as per the Church web page accessed 10th July 2016 at http://peopleof.oureverydaylife.com/lutheran-church-first-communion-2607.html indicating no age limit, and indicating that the Church and its members ponder giving Communion to infants while, in the meanwhile, the recommended age is at a time when the child, parents and clergy can decided individually on a per-child basis, often around the age of 10, as if a child's consent to adulterated ethanol is mature at that stage. Between this church and other Lutheran houses of worship in RI, there are at least 22 masses celebrated weekly in this fashion, material evidence of which is only hearsay at this point, but hearsay from those churches' own publications. Subsection "(d)" of the RI State general ban on giving wine to children[17] creates a statutory exemption for these activities. The statutory protection comes with no registration or enrollment process, authenticity check, safety procedure filing, compliance officer dictate, parental approval requirement, material analysis, or any other government scrutiny. All of the information in this paragraph is supported by sworn material witness evidence of the Churches' publications at given dates, presumedly still visible there as shown in the material evidence.

---

[17] *ibid*

<u>Episcopalian Service of Adulterated Wine to Children Protected by State Law</u>

20. Episcopalians serve wine in Communion to any children who seek it, in no fewer than 33 masses per week in RI according to those churches' own publications, as attested to in material evidence. Subsection "(d)" of the RI State general ban on giving wine to children[18] creates a statutory exemption for these activities. The statutory protection comes with no registration or enrollment process, authenticity check, safety procedure filing, compliance officer dictate, parental approval requirement, material analysis, or any other government scrutiny.

<u>Plaintiffs' "Originalist" Cannabis-based Communion Significantly Burdened by State Law</u>

21. Plaintiffs founded and operate a tiny un-incorporated Rhode Island religious sect, called "The Healing Church . . .IN R.I.." Plaintiffs describe their sect as "Originalist" in large part because they interpret the ancient Hebrew Biblical therapeutic plant "KNH BSM" to be cannabis, and so they grow/use the stuff copiously according to what they feel are Biblical instructions to heal people with the plant's oils as per James 5:14, which refers to an oil made from an Exodus 30:23 recipe containing "KNH BSM", a suspiciously cannabis-like plant in its name and Biblical botanical depictions as sworn in affidavit evidence referencing relevant Biblical passages.

22. In Plaintiffs' interpretation:

---

[18] *ibid*

A. They cannot formally enroll in any cannabis ban exemption lists, because of the Biblical prohibition for KNH BSM-using clergy at Numbers 1:49-50 against registration for "census," a term referred to an annual citizens' head-count for compulsory incense distribution -- exemption lists, such as medical cannabis or agricultural hemp exemptions are offensive to the Plaintiffs' faith; and

B. "Church" for Plaintiffs consists of the Biblical instruction "wherever two or more are gathered in [Christ's] name," and often consists of cannabis used in Biblically-appropriate forms such as smoking, eating, drinking, and especially topical anointment. Certain sites such as Providence's "Well of the Promise and the Prophecy" (a well, incidentally, from whence every modern nation of the globe's Constitutional religious freedom sprang, borrowed as it was from the 1787 US Constitution's ensconcement of a fundamental right first recognized at, and borrowed by the Constitution from, the 1636 Wellspring Native American land grant to RI's founder Roger Williams, sealed with a covenant to protect water rights and religious freedom there for all time).

C. the Well referenced above is the very same one prophesied by St. John at Rev. 22:2, where a "City of God" will host a Wellspring at which 12 Trees (plural) of Life will grow to heal nations. Plaintiffs say in affidavit evidence that botanical depictions of the mystical Tree found in the Books of Genesis, Ezekiel, Isaiah, Daniel, and St. John's Revelation reveal it to be quite cannabis-like in form and function, and so is one and the same. Plaintiffs allege that on or about May 20, 2015, when attacked by federal police at the Sacred Well site,

God answered with a freak earthquake quite close to the site in the early morning after the attack, bolstering their belief that they are right in their practices and expression.

D. Plaintiffs adduce in affidavit evidence that the Bible depicts a golden ruler (canon) made of Biblical KNH BSM's stalk, being used to measure the Temple of Solomon's dimensions in St. John's Revelation and elsewhere. Plaintiff Alan Gordon, a master free mason in evidence, says this is a clue of ancient cannabis-related Biblical code, and that the Bible contains much more, some of which he may reveal without violating any masonic oaths, upon request.

23. By allowing unscrutinized (in rational basis) normally-banned substance use (wine distribution to children, even when adulterated), RI law and discretionary practice improperly "Establish" a form of Bible-based worship undertaken by JCEL faiths while dis-establishing the One True Faith.

24. Neutral laws of general applicability which burden some religious practice are not always in law subject to rational basis review ("compelling State interest, etc.). Leading case law on the matter is *Cantwell v. Connecticut*, 310 U. S. 296, 310 U. S. 304-307 (1940) (as cited by the late Justice Scalia at p. 881 of leading case of *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)) in which Jehovah's Witnesses, nearly beaten for preaching in a Catholic laborer neighborhood, were charged for essentially risking affray against themselves, and for failure to have a public speaking permit the application form for which asked the applicants' religion, generally applicable to all applicants. Justice

O'Connor, concurring, said at p. 893 that the Constitution applies to the States in such circumstances, and that no Government regulation of religion may be tolerated as per *Cantwell (1940)*.

25. The Supreme Court in *Cantwell* found that (unlike modern RFRA claims), the federal judiciary had special federal power to reach into State law, which engaged when concurrent non-religious fundamental rights breaches occurred in tandem with the religious expression burdens. In *Cantwell,* the correct level of scrutiny was strict, not rational, because an Executive's generally-applicable demand to know an applicant's faith while considering a fundamental freedom application, even if a legislature "finds" it necessary, was such an inherently deliberate affront to religious freedom that no rational review could even be entertained, nor should be. It is a matter for strict scrutiny (*is it genuine expression, and it is burdened?*) and one which gives the federal Courts extraordinary powers to reach into matters of State law as per *Smith,* a case in which the Supreme Court said that threshold was not, in evidence, crossed.


Conclusion

26. The State of RI has apparently consumed itself in fits of sense-affecting bias, presumedly the result of racist-origined statutory language, decades of racially unequal enforcement, and religious discrimination so venal that, faced with the truth, the guilt of the countless wrongly-brutalized persons affected is too great to bear. Had that been an impediment to stopping NAZIsm, British occupation of India, or US Jim Crow laws, the world would be an even more tragic place than it is.

27. Plaintiffs do not ask the federal Courts to interpret the State's medical cannabis laws favoring the Plaintiffs -- the Plaintiffs ask the federal Courts to note the absurd manner in which the State enforces its laws on those who declare their faith to be the One True Faith. This level of discrimination and bias infects others, is patently unconstitutional, and may be responsible for what has been called *The New Jim Crow,* the worst racial tragedy of the past 100 years of US history.


Anne Armstrong                                    Alan Gordon


_____  _____ and _____  _____

[signature]              [date]              [signature]              [date]


99 Hudson Pond Road                          99 Hudson Pond Road

West Greenwich, Rhode Island 02817           West Greenwich, Rhode Island 02817

**MOTIONS:**

1. **FOR PRELIMINARY INJUNCTION AND OR/STAY OF PENDING STATE LEGAL OR ACTUAL ACTION AGAINST PLAINTIFFS' CANNABIS**

   A. The Defendant State will not be able to show a significant likelihood of success at trial on the merits, their position being indefensible.

   B. The *status quo,* both last autumn and this year, is to leave the cannabis in the ground

   C. The public interest, as evidenced by polls and votes, does not favor destroying the cannabis, and the balance of equities favors smashing the discriminatory language's effect on the law.

   D. Irrevocability falls to letting the cannabis live, for once cut down in a given grow season, it cannot be replaced.

2. *IN LIMINE,* **TO BAR THE DEFENDANT FROM USING DEROGATORY, RACIALLY, ETHNICALLY AND NATIONALLY BIASING LANGUAGE BEFORE THE TRIBUNAL OF FACT AND/OR LAW.**

   and

3. **FOR THE COURT TO INSTRUCT ITSELF, PRIOR TO HEARING ANY OTHER MATTERS, THAT THE DEFENDANT'S USE OF ALTERNATE WORD CHOICE FOR CANNABIS, IN THE FORM OF A MIS-SPELLED FOREIGN**

**DEROGATORY WORD, IS UNDULY DEROGATORY, RACIALLY, ETHNICALLY AND NATIONALLY BIASING LANGUAGE BEFORE THE TRIBUNAL OF FACT AND/OR LAW, AND HENCE SPOILS FAIR TRIAL AND DUE PROCESS FOR THOSE ASSOCIATED WITH IT.**

A. The Defense's relies in statute, Court filings, and speech upon a fake name for cannabis, a name which is heavily racist, ethnicist and nationalist in origin, being a mis-spelled foreign slang word not used in the law of any other country in the world (not even in the world's country of origin). The name is in no way probative of what cannabis actually is, and is historically disprobative, and yet is used with no legitimate State interest other than preserving the momentum of a great evil institutional racism engine. Disprobative language, of a prejudicial nature, with no compelling State interest, violates the Due Process and Fair Trial clauses of the US Constitution as per *Holbrook v Flynn (475 U.S. 560)*. The Plaintiffs are placed in the awkward position of having to, in effect, sue the government over unfair limitations in a law equivalent to a fictional "[insert racial/ethnic derogatory term] Voting Rights Act" -- due process and fair trial become very difficult, especially given *Holbrook v Flynn (475 U.S. 560)*'s rule at p. 570 that once the Court is exposed to language factually deemed apparently biasing, the Court's own opinion as to whether the biasing language struck home becomes irrelevant, apparency having already been achieved.

B. In previous State Court filings, the Defendant State used the term "Black market" to describe activities the Plaintiffs were feared to be risking. The term "Black market"

arose in WWI and WWII German rationing environments, and, given the allegations made factually in the instant action, we implore the Court to bar any use of. And replace with serviceable phraseology derogatory phrases like "black market," (replace with "underground") "blacklisted" and "blackballed" unless used in positive-only contexts, like, for example, "The Congressional Black Caucus knew Alan Gordon was not Black, but Blacklisted him as an honorary Black in order to enable him to collect Reparations."

Anne Armstrong

_____ and
[signature]            [date]

401-304-6546

99 Hudson Pond Road

West Greenwich, Rhode Island 02817

7-15-16

St. Bonaventure,
Pray for us!

Alan Gordon

_____  7/15/2016
[signature]            [date]

99 Hudson Pond Road

West Greenwich, Rhode Island 02817